# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

March 2, 2018

**Via Hand, Email and ECF**
The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

Re: **United States v. Patrick Considine, 16-CR-336 (NGG)**

Your Honor:

I write in anticipation of sentencing in this case, which is currently scheduled for March 7, 2018.  By chronological age, Patrick Considine is a fifty-two year old man, but he inhabits a significantly older body: his physical, mental, and emotional health are in decline.  Mr. Considine pled guilty to committing a bank robbery via a note on May 7, 2014.  His life prior to his arrest was defined by his addiction to controlled substances.  Substance use disorders run deep through the Considine family: both parents suffered both before his birth and throughout his childhood; his older siblings were addicted to drugs by the time he was born.  Growing up in the clutches of drug and alcohol addiction normalized their abuse for Mr. Considine, who began using alcohol and drugs at just ten years old, spurring a lifetime – four decades – of struggle.

The nearly four years that followed Mr. Considine's arrest have been marked by his progressively deteriorating health.  For the first three and a half years, Mr. Considine finally got a grip on his drug addiction.  From his release on June 23, 2014 until his Presentence Investigation interview on September 20, 2017, Mr. Considine was in perfect compliance, including consistently negative monthly drug tests.  After a protracted process of negotiations between the Federal Defenders and the United States Attorneys' Offices for the Southern and Eastern Districts, this District accepted transfer of Mr. Considine's Southern District case with the expectation that he would join the Eastern District Pretrial Opportunities Program ("POP").  We hoped that through that intensive alternative court program, he might earn a deferred prosecution.

Unfortunately, Mr. Considine soon thereafter fell victim to major medical conditions.  He spent much of 2016 hospitalized due to life-threatening complications from hip surgery, only becoming at all ambulatory in early 2017.  He was essentially confined to his home, and thus unable to participate in POP.  Due to his progress in three and a half years of supervision, Pretrial Services recommended that the United States Attorneys' Office defer prosecution of this case.  Regrettably, our application was denied.

On May 12, 2017, Mr. Considine pled guilty to Count One of the information.  Though he was arrested nine times in 2010 and 2011, and once in 2014, for solely misdemeanor offenses stemming directly from his drug addiction – simple possession of controlled substances, and petty shoplifting offenses to pay for his addiction – Mr. Considine has never spent any prolonged period of time in jail.  The stress of his pending sentencing began to gnaw at him.  His mental health began to decline alongside his physical health.  Having only just advanced from a walker to a cane, and in anticipation of yet another surgery, Mr. Considine was overwhelmed by the thought of years of incarceration.  On the night before his Presentence Investigation interview ("PSI"), September 19, 2017, he relapsed.  After forty months of sobriety – the longest stretch of his life since 2003 – Mr. Considine used three bags of heroin.  He admitted use at his PSI, and submitted his urine sample knowing it would come back positive.[1]

Mr. Considine's anxiety and depression sank him back into the depths he had not known since prior to his arrest, and four days later he was back to whence he came in 2014: shoplifting to pay for heroin.  He was caught and incarcerated in Staten Island, serving a forty-five day sentence on Rikers Island.  But for all its well-deserved notoriety, the jail did serve to set Mr. Considine back on course.  He was prescribed methadone, which controlled his cravings.  He was released by Judge Reyes on November 2, 2017, on the condition that he proceed directly to inpatient drug treatment.  He has been in overall compliance with the Palladia/Services for the Underserved inpatient drug program, along with routine methadone treatment, since his release.

With the consent of his Pretrial Services Officer, Mr. Considine completed treatment in mid-February 2018 and underwent an additional hip surgery at NYU Langone Hospital.  Though it first appeared to succeed, in less than two weeks, he underwent a fourth hip surgery.  He now resides with his elderly mother, and is himself in another lengthy period of recovery.  In short, Mr. Considine is a man whose body, for reasons both within and beyond his control, has betrayed him.  We respectfully submit that a non-incarceratory sentence is appropriate in this case.

## I.   Objections to the Presentence Investigation Report

Mr. Considine raises several objections and updates to the Presentence Investigation Report ("PSR").  Mr. Considine and the government signed a plea agreement in this case.  *See* Exhibit A (plea agreement).  While the plea agreement, of course, is not binding on the Court or the Probation Department, the PSR reaches a higher Guidelines estimate than the parties: 70 to 87 months, rather than 57 to 71 months.  *Compare* Exhibit A at ¶2 *with* PSR at ¶71.  While we submit that both estimates are inappropriate given the 18 U.S.C. § 3553(a) factors in this case,

---

[1] Mr. Considine has always been completely forthcoming about his substance use.  He acknowledges that his PSI urinalysis returned positive for both cocaine and heroin.  He reports that he only used heroin, which has been his dominant drug of choice for nearly 40 years.  It is Mr. Considine's belief that trace quantities of cocaine may have been present in his blood due to the less-than-sterile equipment of his street-level drug dealer.  He does not seek to challenge the urinalysis.

the difference is a +2 enhancement by Probation for the possession or brandishing of a dangerous weapon. PSR at ¶16. Though this was originally alleged in a wanted posted, Mr. Considine did not in fact possess or display any weapon, as reflected by his plea agreement. The enhancement should not apply.

While Mr. Considine admits the facts of PSR ¶¶ 8-9, to which he did not plead guilty as part of his plea agreement, he denies that he is the person reflected in PSR ¶ 7. Notably, while the government charged the three bank robberies in PSR ¶¶ 5, 8, and 9 in the Information, they did not charge Mr. Considine with the May 12, 2014 offense at Investors Bank alleged in ¶ 7.

Paragraph 59 of the PSR reflects a typo: Mr. Considine used heroin daily from 2010 until the time of his arrest in 2014, not 2017. As reflected by his monthly negative drug tests by Pretrial Services, Mr. Considine did not use heroin – or any other drug – until the day before his PSI, September 19, 2017. His relapse lasted a total of four days.

Finally, PSR ¶ 58 should be updated to reflect Mr. Considine's progress since its November 6, 2017 filing. As previously noted, he was released directly into the Palladia/Services for the Underserved inpatient drug program, where he completed three months of intensive inpatient treatment. He continues his methadone maintenance, and was medically discharged from the program with the consent of his Pretrial Services Officer. He maintains contact and is in compliance with all of his reporting obligations.

## II.    Criminal History Category V Over-Represents the Seriousness of Mr. Considine's Criminal History

While Part B of the PSR accurately recounts Mr. Considine's criminal history and applies the correct calculations, "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history." U.S.S.G. § 4A1.3(b). As a result, the Court should consider a downward departure. As indicated in PSR ¶¶ 26-36, Mr. Considine has eleven criminal convictions. They are entirely misdemeanors; they all reflect or stem directly from his drug addiction. Nine of the convictions are from one fifteen-month stretch of a then forty-five year old man's life. One immediately preceded the instant offense, when Mr. Considine hit rock-bottom in 2014, and the final offense was during his recent, very short period of relapse, three days following his PSI.

While Mr. Considine does not remotely suggest that it is excusable to shoplift to support his drug addiction (or for that matter, that simple possession of drugs is permissible under the law), Criminal History Category V reflects a level of criminality that is simply inaccurate in this case. Over four decades of drug addiction, he resorted to petty crime for just over one year, prior to the instant offense. The Court should consider a significant downward departure from the second-highest criminal history category to reflect both his overwhelmingly law-abiding life and the role his addiction has played in his entirely non-violent prior conduct.

3

III.   **Mr. Considine's History and Characteristics Provide Significant Mitigation**

A.   Pre-Arrest Background

Patrick Considine was born on July 30, 1965 in Manhattan to Helen and Thomas Considine.  He grew up in Queens.  Mr. Considine's parents were both alcoholics well before Patrick was born, and Helen washed down her amphetamines and sleeping pills with alcohol throughout her pregnancy.  Helen did not enter recovery until Mr. Considine was already an adult.  His father never entered recovery; he died an alcoholic when Mr. Considine was twenty-four.  His oldest siblings were well into their own addictions by the time he was born.

The physiological and environmental context for Mr. Considine's upbringing put him at extreme risk for addiction.  When he was ten years old, his parents separated.  The divorce was a stress factor for Patrick, who was equally close to both parents.  After the separation, Mr. Considine and his younger sister moved in with their father, who – when he was home – constantly drank in front of the children.  More often, he was at the bar, leaving them entirely unsupervised.  It was during this time that Patrick started drinking. He was ten – and still in elementary school.  Raised in an environment where every adult in his home used alcohol and drugs in response to problems and stress, Patrick did the same.  Never having developed normal coping skills, the use of illicit substances came as no surprise to anyone.  Over time, he would go on to self-medicate with pills, PCP, cocaine, barbiturates, and heroin.  Letters from the family, attached as Exhibit B, paint a more vivid portrait of the dysfunction in the home than I attempt here.  Though these letters were initially submitted in support of Mr. Considine's application to transfer jurisdiction to this Court to enter the POP program, I have confirmed that they are all still accurate.  Mr. Considine continues to have the full support of his siblings, who wish to share these words with Your Honor.

Scientific research suggests that there is a genetic component to many instances of addiction.  *See, e.g.*, Agrawal, A. and Lynskey, M.T. (2008), *Are there genetic influences on addiction: evidence from family, adoption and twin studies*.  Addiction, 103: 1069-1081; Levran, O. *et al*. (2008), *Genetic susceptibility to heroin addiction: a candidate gene association study.* Genes, Brain and Behavior, 7: 720-729.  Importantly, research also suggests that even after controls for hereditary influence are curtailed, addiction continues to run in the family.  *See, e.g.*, Kendler, K.S., *et al*. (2013), Within-Family Environmental Transmission of Drug Abuse: A Swedish National Study. JAMA Psychiatry, 70(2): 235-242.  The Considine family fits the bill in no uncertain terms.

From ages twenty-four until forty, Mr. Considine gained both his sobriety and the concomitant joys of ordinary working, family life.  After entering recovery,Mr. Considine obtained his Associate's Degree at the Harry Van Arsdale Center for Labor Studies, where he studied to be an electrician.  He began his apprenticeship in 1989, and became a journeyman electrician when he graduated in 1995.  In 1989, Mr. Considine met Maria Moreno.  They fell in love and married in 1991.  Both wanted children and looked forward to being good parents.  But,

they found themselves unable to conceive naturally, putting stress on their marriage.  After seeking help in 2003, Mr. Considine was diagnosed with varicocele, a condition which causes low sperm count.  He agreed to undergo surgery.  As a standard part of post-surgical care, Mr. Considine was prescribed Vicodin and Percocet.  To everyone's great joy, Maria was eventually able to become pregnant through *in vitro* fertilization.

Shortly before the birth of his son Christopher on December 14, 2004, Mr. Considine injured his shoulder.  His doctor recommended that he receive surgery to fix his shoulder, but Mr. Considine could not afford to take time off work for a surgical procedure and recovery period.  Instead, he continued to take pain killers for his shoulder so that he could keep working.  Having already been addicted to opioids before, these strong pain killers began to trigger Mr. Considine's addiction once more.  At first, he continued to take the pain killers as directed, but his addiction took over and he began using more and more.

Mr. Considine's drug use catalyzed a downward spiral and his relationship with Maria ended.  In full blown addiction, Mr. Considine lost everything – including his son.  Until the arrest in this case, he was using very dangerous amounts of heroin and alcohol.  At the peak of Mr. Considine's relapse, he was drinking 8-12 drinks a day, in addition to 10-20 bags of heroin (or almost 2 mg).  He went in and out of detoxification programs and short-term treatment, but it was inadequate to meet his needs.  He succumbed to increasingly erratic and irrational behaviors, landing himself in his current predicament.  Though Mr. Considine's bottom had previously been petty shoplifting, the depths of his desperation led him to the three bank robberies reflected in the information, all within a three week period, all by note.  When Mr. Considine was arrested, he expressed "relief knowing he got caught and knowing he doesn't have to keep worrying about when he is going to get arrested.  He later stated, 'It's crazy what you end up doing for drugs.'" PSR ¶ 6.

B.    Post-Arrest Progress and Complications

Mr. Considine's arrest in 2014 served as a long overdue wake-up call.  After three weeks at the MCC, Mr. Considine was released on June 23, 2014 under strict conditions, at first requiring residential drug treatment, followed by home detention with electronic monitoring.  After a series of short-term programs to meet his acute needs, Mr. Considine completed long-term treatment at the VIP Men's Residence program in the Bronx, submitting all negative toxicology screens, and engaging in both individual and group cognitive behavioral therapy.  He completed treatment on July 1, 2015 at the Palladia Ujima Community Residence, also in the Bronx, and Judge Forrest lifted his home detention requirement.

As Mr. Considine's family explain in their letters, his recovery has enabled Mr. Considine to begin to repair his broken family relationships – most notably, with his son.  He has the strong and continuing support of his mother and siblings, all of whom are finally in recovery at the same time.  Their shared history provides an uncommonly strong understanding.

From September 11, 2015 until June 7, 2016, the attorneys for the parties in the Southern District of New York negotiated and finally completed transfer to our District for purposes of enrollment in POP, our drug court.  It was everyone's intention that Mr. Considine continue to maintain his sobriety and engage in the intensive POP community setting and strict Pretrial supervision, with an optimistic view towards possible deferral of prosecution of this case. Unfortunately, Mr. Considine's deteriorating health made this participation impossible.  In the first half of 2016, Mr. Considine underwent two surgeries for hip replacement at Columbia Presbyterian Hospital.  He developed a post-operative infection that spread to his blood and became septic, preventing the completion of his hip operation.  Additional emergency surgery was required in order to remove nearly three inches of his infected femur.  In addition to the partial amputation, the leg swelled to twice its normal size, leaving him bedridden and unable to walk.  It was only in December of 2016 that Mr. Considine could begin to move around, leaving his apartment only with the aid of Access-a-Ride, and ambulating with a walker.  Being out of the house for even short times left him exhausted, and the pain from his hip has not relented.

Following the infection in June 2016, Mr. Considine's surgeons advised him to allow his body to heal for a minimum of one year before they would complete the necessary surgical procedures, so as to best fend off recurrence of infection.  As indicated, in September 2017, the night before his PSI, stress and fear overwhelmed Mr. Considine, and he relapsed on heroin.  He had submitted negative monthly drug tests, taken at home visits, for forty months.  His relapse lasted four days, before he was arrested for shoplifting – in his prosthetic shoe and hobbling on a cane.  He began methadone treatment at Rikers Island.  Upon his release by Judge Reyes, he resumed methadone treatment, and is in methadone maintenance today.  He went directly to inpatient treatment, which he completed in February of this year.

Approximately one month ago, Mr. Considine was finally cleared for the completion of his hip replacement surgery, which occurred at NYU Langone Hospital.  While his doctors were not able to repair the full three inches of lost leg, he recovered some length, and looked forward to a full recovery and long overdue return to employment.  Alas, the new hip popped out of its socket, and Mr. Considine returned to NYU last week for yet a fourth hip surgery.  He is presently confined to his elderly mother's home.  His mental outlook is still strong, and he has maintained his sobriety, but the past does not suggest a full recovery for this frail man.  Between his decades of substance abuse and these acute medical issues, it is no overstatement that it is a miracle that Patrick Considine is still alive.

## IV.    A Non-Incarceratory Sentence is Sufficient, But Not Greater than Necessary

Bank robbery is inarguably a serious offense.  Mr. Considine deeply regrets his irrational, impulsive, drug-fueled conduct, which marked a distinct aberration from more than fifty years as a law-abiding, employed man, and a life as a devoted father.  And it marked an aberration as well from his previous low of petty shoplifting.  But taking the long view of Mr. Considine's life, and the balance of the 18 U.S.C. § 3553(a) factors, we respectfully urge that additional incarceration is not the appropriate way to punish Mr. Considine.  Prior to Mr. Considine's four day relapse, he

had demonstrated both that he had turned an important corner on his addition and resulting behaviors, and also that his declining health made further criminal activity physically unlikely. Mr. Considine is the first to acknowledge that his behaviors from September 19-23, 2017 – but especially September 23 – give the government and the Court good reason to doubt his progress and deny him mercy.  Those actions earned him 45 days on Rikers Island.  It is our hope that the four months of compliance that followed can repair the trust he had otherwise earned.

We thus seek a non-incarceratory sentence that will allow Mr. Considine an opportunity to continue to prove his rehabilitation.  Mr. Considine accepts responsibility for his actions and will abide by whatever period of supervision the Court deems appropriate.  He understands that should he misstep even once, he will be back before Your Honor, facing a significant term of incarceration.  Aside from the brief relapse, he has already demonstrated his ability to comply with conditions of release for nearly four years, and quite frankly, his health has once again limited his ability to so much as walk, let alone to commit crime.  Mr. Considine's body has betrayed him to the point where incarceration would serve only to threaten his health – and indeed, his life – by eliminating his access to necessary medical care.  This reality serves as a powerful motivating force for Mr. Considine to stay clean and straight.

In spite of the harsh realities of his current condition, Mr. Considine remains hopeful against the odds that he will recover fully from the successful completion of his hip surgeries, maintain his sobriety, and return to work as an electrician.  He remains intent on being a permanent and solid father to his son, to both receiving and providing support to his siblings, and being there for his aging mother, who has herself been in and out of the hospital.  He looks forward to proving his recovery to this Court.  A significant term of supervision is thus sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).  We respectfully urge the Court accordingly.

Respectfully Submitted,

/s/

Mia Eisner-Grynberg
Staff Attorney
(718) 330-1257

cc:    AUSA Ryan Harris
       USPO Kristen McKeown
       PTSO Laura Fahmy-Tranchina

7

# **<u>EXHIBIT A</u>**

TJS:RCH
F. # 2016R01587

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

- against -

PATRICK CONSIDINE,

                Defendant.

– – – – – – – – – – – – – – – – – X

<u>PLEA AGREEMENT</u>

16 CR 336 (NGG)

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York (the "Office") and PATRICK CONSIDINE (the "defendant") agree to the following:

1.      The defendant will plead guilty to Count One of the above-captioned information, charging a violation of 18 U.S.C. § 2113(a). The count carries the following statutory penalties:

      a.      Maximum term of imprisonment: 20 years
                (18 U.S.C. § 2113(a)).

      b.      Minimum term of imprisonment: 0 years
                (18 U.S.C. § 2113(a)).

      c.      Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision
                (18 U.S.C. § 3583 (b) & (e)).

d.  Maximum fine:  Greater of $250,000, or twice the gross gain or twice the gross loss
(18 U.S.C. § 3571(b)(2), (b)(5) and (e)).

e.  Restitution:  Defendant agrees to pay restitution in the amount of $9,743.
(18 U.S.C. §§ 3663A and 3664)

f.  $100 special assessment
(18 U.S.C. § 3013).

g.  Other penalties: criminal forfeiture as provided below in paragraphs 6 through 13.
(18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c)).

2.  The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case.  The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence.  See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").  The Office estimates the likely adjusted offense level

under the Guidelines to be 22, which is predicated on the following Guidelines calculation:

| | |
|---|---|
| Base Offense Level (§ 2B3.1(a)) | 20 |
| Plus: Financial Institution Robbery (§ 2B3.1(b)(1)) | +2 |
| Total: | 22 |

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 20 and a range of imprisonment of 63 - 78 months, assuming that the defendant falls within Criminal History Category V. Furthermore, if the defendant has accepted responsibility as described above, to the satisfaction of the Office, and if the defendant pleads guilty on or before May 31, 2017, an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), resulting in an adjusted offense level of 19. This level carries a range of imprisonment of 57 - 71 months, assuming that the defendant falls within Criminal History Category V. The defendant agrees to pay restitution in the amount of $9,743.00.

3. The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

4. The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 78 months or below. This waiver is

binding without regard to the sentencing analysis used by the Court.  The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the defendant's plea is later withdrawn.  Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.  The defendant waives any right to additional disclosure from the government in connection with the guilty plea.  The defendant agrees that with respect to all charges referred to in paragraphs 1 and 5(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law.  The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

5.     The Office agrees that:

a.     no further criminal charges will be brought against the defendant for: (i) the robbery of Santander Bank, 83-20 Roosevelt Avenue, Queens, New York, on May 7, 2014; (ii) the robbery of Astoria Federal Savings Bank, 72-35 Broadway, Queens, New York, on May 16, 2014; and (iii) the robbery of HSBC Bank, 101 West 14th Street, New York, New York, on May 27, 2014, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq., and at the time of sentence, it will move to dismiss the remaining counts of the Information with prejudice;

and, based upon information now known to the Office, it will

b.     take no position concerning where within the Guidelines range determined by the Court the sentence should fall; and

       c.       make no motion for an upward departure under the Sentencing
Guidelines.

If information relevant to sentencing, as determined by the Office, becomes known to the
Office after the date of this agreement, the Office will not be bound by paragraphs 5(b) and
5(c). Should it be judged by the Office that the defendant has violated any provision of this
agreement, the defendant will not be released from his plea of guilty but this Office will be
released from its obligations under this agreement, including but not limited to: (a) moving for
the additional one-level downward adjustment for timely acceptance of responsibility
described in paragraph 2 above; and (b) the provisions of paragraphs 5(a)-(c).

       6.       The defendant acknowledges that he owns property that is subject to
forfeiture as a result of his violation of 18 U.S.C. § 2113(a), as alleged in the Information.
Pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c), the defendant
consents to the entry of a forfeiture money judgment in the amount of nine thousand seven
hundred forty-three dollars and zero cents ($9,743.00) (the "Forfeiture Money Judgment"),
as any property, real or personal, which constitutes or is derived from proceeds traceable to a
violation of 18 U.S.C. § 2113(a), and/or as substitute assets.

       7.       The Forfeiture Money Judgment shall be paid in full on or before the
date of sentencing (the "Due Date"). All payments made by the defendant toward the
Forfeiture Money Judgment shall be by money order, certified or official bank check,
payable to the "United States Marshals Service." The defendant shall cause said check to be
sent by overnight mail delivery to Assistant United States Attorney, Tanya Y. Hill, United
States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East,
Brooklyn, New York 11201 with the criminal docket number noted on the face of the check.

8.      If the Forfeiture Money Judgment is not paid in full on or before the Due Date, interest shall accrue on any unpaid portion thereon at the judgment rate of interest from that date.  Further, if the defendant fails to pay any portion of the Forfeiture Money Judgment on or before the Due Date, the defendant consents to the forfeiture of any other property of his up to the amount of the unpaid Forfeiture Money Judgment, pursuant to 21 U.S.C. § 853(p), the Federal Debt Collection Procedures Act, or any other applicable law. The defendant acknowledges that the Office, at its sole discretion, may seek to forfeit the amount of the Forfeiture Money Judgment through commencement of an administrative or civil forfeiture proceeding.

9.      The defendant agrees that the Forfeiture Money Judgment constitutes any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 2113(a), and/or as substitute assets, and thus is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c). The defendant consents to the entry of an Order of Forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

10.      The defendant agrees to effectuate the payment of the Forfeiture Money Judgment.  The defendant agrees not to file a claim or petition seeking remission or contesting the forfeiture of any property against which the government seeks to execute the Forfeiture Money Judgment in any administrative or judicial proceeding.  The defendant further agrees not to assist any person or entity in the filing of any claim or petition seeking remission or contesting the forfeiture of any property against which the government seeks to execute the entry and payment of the Forfeiture Money Judgment.

11.     The failure of the defendant to forfeit any monies and/or properties as required under this agreement, including the failure of the defendant to execute any document to accomplish the same on timely notice to do so, may constitute a material breach of this agreement.  Upon such a breach, the defendant will not be entitled to withdraw the plea, but the Office may bring additional criminal charges against the defendant.

12.     The defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of any monies and/or properties forfeited hereunder, including notice set forth in an indictment or information.  In addition, the defendant knowingly and voluntarily waives his right, if any, to a jury trial on the forfeiture of the monies and/or properties forfeited hereunder, and waives all constitutional, legal and equitable defenses to the forfeiture of said monies and/ or properties, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto clause of the Constitution, any statute of limitations, venue, or any defense under the Eighth Amendment, including a claim of excessive fines.

13.     The defendant agrees that the entry and payment of the Forfeiture Money Judgment are not to be considered payment of a fine, penalty, restitution, or any income taxes that may be due, and shall survive bankruptcy.

14. This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

15. Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements, if applicable, this agreement supersedes all prior promises, agreements or conditions between the parties. To become effective, this agreement must be signed by all signatories listed below.

Dated: Brooklyn, New York
      April __, 2017

<div style="margin-left:40%">

BRIDGET M. ROHDE

Acting United States Attorney
Eastern District of New York

By: _____

Ryan C. Harris
Assistant United States Attorney

Approved by:

_____

Supervising Assistant U.S. Attorney

</div>

I have read the entire agreement and discussed it with my attorney. I understand all of its terms and am entering into it knowingly and voluntarily.

_____
PATRICK CONSIDINE
Defendant

Approved by:

_____
Mia Eisner-Grynberg, Esq.
Counsel to Defendant

8

# **<u>EXHIBIT B</u>**

Stacey Lynch
56 Catherine Avenue
Franklin Square, NY 11010

February 2, 2015

Sabrina P. Shroff
Federal Defenders of New York, Inc.
52 Duane Street – 10th Floor
New York, NY 10007

Dear Ms. Shroff:

Looking back, it seems that drinking and drug abuse in Patrick's life (and my life) were almost inevitable. All of my early family memories revolve around drinking. My father was an everyday drinker. He often drank until he passed out. When he was still working, there were nights on end when he did not even come home. My mother went out drinking often and came home hung over often. A typical weekend would have both parents either out or hungover and us kids fending for ourselves. At times my mother ended up in the psychiatric ward. Every family event or party revolved around drinking. Parents, grandparents, older siblings, cousins, aunts, uncles, etc. Everyone drank until they were drunk. I remember sneaking sips of beer as young as 4 or 5 years old, with Patrick right by my side doing it with me.

Patrick is 2 years older than me and we were always part of the same group of friends. As kids, we lived across the street from a park. The younger kids had the playground. The teenagers hung out by the tables. They were there drinking and taking drugs right out in the open. We couldn't wait to grow up enough to join the tables. By the time we were around 12 we were hanging out at those tables, drinking, smoking pot and experimenting with other pills and stuff. By the age of 14 we had moved on to hanging out in bars. When I think about it now, it seems crazy. I have a 14 year old child, who to me is still a child, yet at 14 we had been drinking for a few years and had moved on to bar drinking. Our parents knew and no one was stopping us.

By our late teens and early 20's Patrick had been in and out of rehab a few times. Just about every friend we had was a full blown black out drinker and drug addict. Some friends went to rehab, some went to jail, and sadly more than I want to think about died from alcohol or drug abuse. Eventually Patrick went to a long term rehab and when he came out became active in Alcoholics Anonymous and really got his act together. By this time my mother, older brother and sister were also sober. I was still actively partying and losing my friendship with my brother. I watched his life getting better and mine getting worse. Eventually I got sober too. Actually, today is the day I had my last drink, 23 years ago.

Patrick had long term sobriety. Those years were great. We were young, sober and life was really an adventure. We had a large group of friends who were sober. We went on trips. We made lasting friendships. We grew up and had honest friendships and relationships with people. Our family

became much closer. Life was good. In that time Patrick got married, had a child, found a good job and settled down. We all had good lives. Then after years of sobriety he had surgery. After surgery he became hooked on painkillers, which led him out into other drugs. He began chasing the high again. We watched everything fall apart.

Patrick went in and out of rehab and nothing worked. His wife eventually had to ask him to leave, because he was now addicted to heroin and this was no world for his son to be growing up in. Patrick came in and out of our lives, always looking worse, always looking closer to death. His addiction tore our whole family apart. On the one hand we very much understand the power of an addiction, but on the other hand he had a child and wife and responsibilities that he threw away. Every time he got sober he would start a relationship with his son again. Then he would be gone from our lives. His son Christopher didn't understand. He was sad and angry. His grades in school suffered. My mother became old before her time. When we knew where Patrick was we were angry at all he had let slip away and when we didn't know where he was we feared getting the phone call telling us he was dead.

This past year I really thought Patrick was going to die. He looked like his body could not take much more abuse. He rarely visited with us anymore. I think he knew some kind of end was near for him. The day he turned himself in to the police was probably the first peaceful night's sleep my mother had in a long time. At least we knew the call that he had overdosed was not going to come that night. Since then, mercifully Patrick was placed in a long term rehab setting instead of jail. For the first time in many years, I see my brother, my friend is back. His personality is back. He is healthy. He is rebuilding relationships with his family, his son and his AA friends.

The greatest pleasure is watching Patrick and his son Christopher. For a long time Christopher did not want to see Patrick. He was scared and didn't want to be hurt again. Now they see each other almost every weekend and delight in the time they spend together. Another great pleasure is watching my 81 year old mother find peace. Patrick may be 49, but he is still my mother's son and for so long she worried about him. For the first time in a long time our family is at peace. Patrick has true sobriety now. I don't know why this time worked. I don't know why Patrick is better this time, I just know he is. When we were younger I watched Patrick go in and out of rehab and then one day he started getting better and found long term sobriety. When I look at him now, it reminds me of that time back then. Pat has true sobriety. My fear is gone that we are going to lose him again. It's always a day at a time I know, but these days he is mentally and physically doing well and each day I feel confident that he can keep moving forward towards long term sobriety again. He certainly has family and friends to support his recovery.

Sincerely,


Stacey Lynch

**Kerry Smith**

174 Semton Blvd.• Franklin Square, NY 11010
Phone: (516) 481-8987 • E-Mail: cheekyvixen@aol.com

Date: February 3, 2015

Sabrina P. Shroff
Assistant Federal Defender
Federal Defenders of New York, Inc.
52 Duane Street - 10th Floor
New York, NY  10007

Dear Ms. Shroff:

I really hate writing this letter because it makes me reflect on our childhood and examine the ways that our parents let us down.  I really don't want to do that because I know that our parents were just two people in a long succession of good people who loved their children, but who were misguided themselves, struggling with their own pain and problems.

Our parents were both alcoholics and I feel that despite their love, support and good intentions, my siblings and I were left to fend for ourselves in too many ways.  Our parents let us freely roam the neighborhood; they rarely helped us with homework, never pushed us to join teams or clubs, and never mentioned the thought of college.  Those of us who attended college did so because we were lucky enough to be pushed by teachers and friends.  We had to do all the research and enrollment paperwork ourselves, and completely pay our own tuition. All six siblings are smart enough to be successful professionals, but we were never shown a different way of life.  I feel that Patrick just automatically drifted into a blue-collar job and I suspect that as he grew older, he has been very frustrated by the opportunities he missed.

There are six siblings in our family, and we often think of ourselves as two different sets of three kids.  Each set has two girls and one boy.  I guess we view it this way because there's a 5-year gap in the middle, or perhaps because at different times each trio occupied the triple bunk beds in our only room.  I think each trio has different perspectives even though we were all in the same family.  When I was 5 years old, the six siblings' ages were: Tommy(16), Barbara(15), Carol(10), Kerry(5), Patrick (3), Stacey(1).  By this age, my parents were in their 30's, feeling tired and overwhelmed from dealing with

six children ranging from teenagers to babies. My oldest siblings were the Woodstock generation; they had started drinking and using drugs and there were often scenes of fighting and yelling in our limited space. My sister Barbara was often forced to babysit for us when my parents went out. I remember Patrick and I being bored, as we watched her smoking with her friends. I remember Tommy coming home obviously high, urinating on our bedroom floor as he dropped pills and they scattered everywhere. Patrick and I tried to pick them up for him because we had already learned that this would cause trouble if our parents caught him. Of course my parents were boiling over with exhaustion and frustration, probably causing their own drinking to escalate.

At bedtime, I remember my father often yelling at the youngest set of three to go to sleep. As we goofed around and the noise escalated, I can remember him hitting Patrick with his belt. I assume that was because he was the only boy around, but I always felt bad that he was singled out. Patrick was always a handful, with lots of energy. We joke now about the time he was carrying on while we were eating, and my father was so aggravated that he got up and dumped a bowl of farina over his head. Even though we've laughed about it, I can still picture it, and it seems worse now in hindsight when I visualize that Patrick was so young that he was still in a high chair.

By the time I was 5, I should have been going to the public school kindergarten, but I stopped attending after a couple of weeks. When it was time for Patrick to go to kindergarten, my mother and a neighbor dragged him up the block, biting, kicking and screaming to the bus stop. It seems shocking now, but after a few days, Patrick was sent to the bus stop on his own from our 5th floor apartment. Unfortunately, Patrick also hated kindergarten and a neighbor found Patrick a few hours later, hiding in the hallway of our apartment building. After that, my mother gave in and let him quit kindergarten too.

In first grade, I started going to Catholic school, and I think that's what saved all of us. We were taught to follow rules. When I look at old report cards, I'm surprised to see as many as 14 absences in third grade. For me, the absences lessened because I liked school and wanted good grades. Patrick got into more trouble though, despite being very smart. I was both proud and jealous when he won the school's Math Bee and went on to the Diocesan Competition.

In my first or second grade, I can remember crying one morning because I burned my arm while ironing my school uniform. I was overly upset because my mother wouldn't wake up— she was completely unconscious. I was worried that something was very wrong, but Carol made me get dressed and go to school. I guess Patrick and Stacey were on their own while my father was in work and my mother was home hungover.

When Patrick was 5 years old, he was out by himself and saw the Mr. Softee Truck. He wanted ice cream but didn't have money. As the truck was pulling away, Patrick hung onto the serving counter and then fell under the truck. His leg was run over by the back wheels, and the driver was so scared when he heard all the yelling that he backed up and ran over it again. Patrick spent that summer in a wheelchair, and had many treatments to drain the fluids that built up in his leg. Eventually the leg healed, but I have vivid memories during the years that followed, of Patrick crying about the pain in his leg, surrounding his scar. I don't know what if anything my mother did about this. I hope this was given medical attention, but I always felt so sad for the ongoing pain that he endured.

As we grew older, I remember being embarrassed in front of my friends when my father came home from work drunk. But I also remember many times when he sang songs to me and seemed happy as he smoked and drank his beer with a neighbor. Unfortunately, my father suffered from mesothelioma and had to stop working construction jobs. Things became even more difficult financially, and I can remember being very embarrassed when my parents had to start using food stamps. My parents fought more often and eventually separated when I was around 12, and Patrick was 10. My mother started working, and we were often home alone. During the summer, I can remember my mother leaving $5 a day each for Patrick and I to buy lunch, but instead we used the money to buy marijuana. Without fail, we'd chip in with friends to buy several "nickel bags" each day, which usually meant about 8 joints each time. I've started looking through my old pictures, but can't find the one I'm looking for. I have a clear image of Patrick and a friend proudly smoking a joint, and proudly displaying about 8-10 joints. He was probably 10 or 11 years old.

During this same timeframe we had a neighbor up the block who was growing marijuana in his front yard, and of course Patrick noticed it. As it grew bigger he talked about it more and more often. I thought it was all just talk because I certainly wouldn't know what to do with marijuana plants anyway. This didn't stop Patrick though. One night, he came home

with an armful of marijuana and put it in the oven in an attempt to dry it out. I have no idea where my mother was at that time, but Patrick clearly wasn't worried about being caught. Or maybe he just didn't care. My mother had been known to smoke marijuana herself around then, which was another source of embarrassment to me. I remember feeling ashamed when friends pointed out that my mother was smoking with our neighbor's unemployed, middle-aged grandson who was visiting our neighborhood for a while.

It seemed that everyone we knew in our family was getting high, our neighbors were getting high, and all our friends were getting high. Growing older we saw people getting arrested, people dying, people struggling to get sober. We just never saw a different type of lifestyle. Eventually as we grew even older still, all of us were able to move away from that environment and that lifestyle. We all did well, got married and moved on. Patrick became an electrician, and was sober for over 10 years. Unfortunately, he and his wife had a lot of difficulty conceiving a child, which caused years of stress and extra medical expenses. Patrick struggled with his weight at that time and decided to have gastric bypass surgery. Although he lost a lot of weight, I feel that he lost his outlet. That's when he started having a huge gambling problem. I feel like he transferred his outlet from food to gambling. Then he needed shoulder surgery and was prescribed painkillers. This became his new outlet. Eventually he became dependent on opiates and things spiraled out of control. After years of trying to have a child, he lost contact with the son he loves so much because of drugs. He had his car impounded, he was arrested for theft, he lost his job, he lost his family, and he lost his self-respect.

I truly believe that Patrick was so sick and tired of the life he was living that he was looking to get caught. Now that he is sober, Patrick is once again an amazing man. Patrick has a very high IQ; he is a creative artist, a musician, a gentle person with a fantastic sense of humor, and a knack to win over anyone he meets. He is a patient, loving, attentive father to his son Christopher.

Christopher is an exceptional 10-year old; his mother, Marita has done a great job of helping him cope with the absence of his father. She works extremely hard to pay their bills and to raise Christopher as a loving Christian. She never speaks badly about Patrick to him. Christopher understands that Patrick suffers from the illness of addiction and along with Marita, he always says prayers for his Dad to get better. It has been

heartbreaking to watch Christopher suffer from having an absent father. My own son has gone through the same thing because his father also was an alcoholic and drug abuser. I've seen this pattern repeated too many times in our families. Unfortunately, children's heartbreak and longing often turns into anger as they get older. I've seen it with my son, and again this past year with Christopher. This anger is perfectly understandable because even the adults have become increasingly exasperated with Patrick over the years, even though intellectually we know that he suffers from a disease.

My son has been lucky enough to re-establish a relationship with his father who has now been sober for 10 years. It is obviously important for any young man to have a father guide them, and in our case, help them to break the pattern that has been in our families for too many generations. I hope that Patrick and Christopher will have the opportunity to re-establish a normal relationship. I'd really love to see Patrick live the second half of his life in a more clearheaded productive way. More importantly, I pray that Christopher doesn't continue to bear the punishment of having an addicted father. They've both suffered enough.

Sincerely,

Kerry Smith

Helen Considine
174 Semton Boulevard
Franklin Square, NY 11010
516-505-2338

January 18, 2015

Sabrina P. Shroff
Federal Defenders of New York, Inc.
52 Duane Street – 10th Floor
New York, NY 10007

Dear Ms. Shroff:

I am Patrick Considine's mother and I love him dearly. I have 6 children, 9 grandchildren, and 2 great-grandchildren. I love them all and when one of them gets sick I pray to God to help them heal.

Right now I feel that Patrick is healing and thank God that the judge sent him to rehab and not to jail. Patrick has been off drugs for months now and is very much aware of all he has lost: job, home, car, etc. He especially feels the loss of time he has missed with his wife and his 10 year old son, Christopher. I have seen him crying over missing Christopher. They have always been very close. Now when they see each other they both light up with joy. They both suffered and now are beginning to heal. Please don't take them away from each other.

During his many years in the AA/NA programs Patrick helped many others to achieve sobriety. It was only when he was given drugs for pain after a surgery he had that he became addicted again.

I have been in AA for 32 years- my addiction also started through a doctor's prescriptions and went on and on. I know how hard it is to stop using these drugs that friends and I thought were harmless. I also have other family and friends with long-term sobriety and we all understand Patrick's addiction and want to help him. He is well worth saving.

Respectfully yours,

Helen Considine

Barbara Grant
35-51 85th Street #9K
Jackson Heights, NY  11372
917-804-6135

February 3, 2015

Sabrina P. Shroff
Federal Defenders of New York, Inc.
52 Duane Street – 10th Floor
New York, NY  10007

Dear Ms. Shroff:

I am the 2nd of six children and one of Patrick Considine's sisters.  My family has been affected by the disease of alcoholism and addiction for several generations.  My mother has been a member of Alcoholics Anonymous since 1979. My father was also an alcoholic and passed away in 1990. Of their six children, four of us are afflicted with this <u>disease</u> and three of us have long term sobriety/recovery.  I celebrated 25 years clean and sober on January 30th and Patrick was my AA speaker sharing his experience, strength and hope with complete honesty, remorse and hope for a productive future with his family and son.

Eight of us shared a 5th floor, 2 bedroom walk-up apartment.  Our neighbors had similar lifestyles so this was normal to me.  My father was a construction worker and got paid on Thursdays which meant that he would be in one of the many neighborhood Irish bars spending his paycheck.  There were periods when he would be missing for days or weeks at a time and we would all go hungry, existing on starchy, filling foods such as pastas, rice or potatoes.   These absences resulted in arguments between Mom and Dad, many of which were physically violent.  We would try to intervene at times.

My parents were born on the west side of Manhattan and my Dad had a "Westie" mentality and glamorized criminal behaviors.  He had spent three years in prison when he was 19 years old for robbery.  Most family socializing involved friends from similar backgrounds, so again, this was normal.  We were taught that what happened in our home stayed in our home.  Also, that a man's word was his honor so you never "ratted" on partners in crime.  All family parties and get-togethers involved drinking.  I would witness the night going from one of happy sing-alongs to drunken brawls.

I am 10, 12 and 14 years older than Kerry, Patrick and Stacey (the three youngest siblings) so I became a surrogate parent.  I frequently had to take over their care because my parents would often be missing.  Mom would go out to play bingo and would return home drunk in the early hours of the morning and sometimes she'd be missing for days.  There would always be such a feeling of fear about what happened to her, but when she eventually returned home, nothing would be explained.

I remember a day when I had 3 year old Patrick with me at a friend's house.  He was napping on my lap while I smoking pot with a friend.  When he woke up he was quite high from this second-hand exposure and I was afraid to take him home, so I kept him out much longer than required until he straightened up.

Our addictions were certainly influenced by our environmental and emotional factors.  We were never taught how to express our emotions and being told "I love you' by our parents was never said. They showed us in many ways, but had a hard time communicating feelings.  We were never encouraged to

attain higher education. Rather, it was required that we get part-time jobs by the time we were 14 and could get working papers. We grew up poor and always had to work for what we got. Although our parents were both alcoholics, I know that they did their best to raise us. They truly loved us and there were many great times in our close family; beach and lake outings, trips to amusement parks, celebrations for every birthday, Communion, baptism, etc. My Mom was only 17 when she got married and she had six children by the time she was 34 years old. She was always struggling just trying to get by.

I started drinking and drugging in the late 60's at the age of 13 during the era of turn on, tune in, drop out and I embraced the times. I went from being top of the class with a 98% average to a high school dropout. By the time I was 18 years old (1971) I was admitted to a long-term therapeutic community for female addicts. It was located in Graymoor, New York under the care of Father Dan Egan (aka "The Junkie Priest"). I know that this reprieve saved my life because overdosing was becoming a regular occurrence. I learned much about myself, about how to express my feelings and also about my self-worth. I learned that my addiction was not a weakness but that it was an illness. I spent a year in the community house and then spent an additional 9 months in the re-entry stage of the program in Poughkeepsie, NY. During re-entry I was employed and re-introduced to life's responsibilities. I was given drinking privileges while residing at the half-way house because alcoholism and addiction were not yet viewed as a dual addiction problem. I eventually moved back to Woodside, NY and the cycle of addiction began again. I got an apartment around the corner from where I grew up and started hanging out with old friends who were still doing the same things. I substituted alcohol over drugs for a while but eventually started using again.

I allowed my younger siblings to come and hang out in my apartment (Patrick age 13 at the time) and get high and I even supplied him with bags of pot. I remember my Mom getting high with me so I thought this behavior was 'cool'.

Patrick started drinking and getting in trouble at the young age of 11 or 12. By this age my parents had divorced and Patrick and Stacey lived with my Dad. Dad was retired due to asbestos disability and was home for them during their school years. There was very little discipline or restriction for him at home so his progression was rapid.

Patrick had entered AA in 1989 and had been clean and sober for 15 years. He had a surgery sometime around 2004 and was prescribed pain medications during his surgical recovery. This prescribed medication started his relapse. As a result of this relapse Patrick hit a complete spiritual, physical, emotional and financial bottom. He had been very happily married to Marita and had his son Christopher who is now 10 years old. They owned a co-op apartment, a vacation time-share, two vehicles and all the middle class comforts. He was employed by Local 1 Electrician Union (recently reinstated and on a waiting list for employment). Because of his addiction he **LOST everything**; his wife, son, home, cars, employment and most importantly his self-respect and his sanity. The one thing that Patrick has never lost is the complete love of his family. We have been upset, angry, disappointed and completely frustrated by his addiction but also understand that it is a disease and takes people down different paths. Many are fortunate enough to find a program of recovery. We have never given up hope that he would again get sober and become an active member of our family and of society.

Christopher has suffered more than any of us as a result of Patrick's addiction, not understanding why his Dad could not just stop. He started biting his nails, stuttering, losing interest in school, periods of crying, and having inconsistent grades at school. He's had to attend counseling because as a family we never knew how much information to let him know about his Dad's whereabouts or condition and needed professional interventions in this area. When he was 5 or 6 years old we'd tell him that daddy was away working in California or make other excuses for his absences. As he got a bit older we felt we could not continue to hide Patrick's addiction from him. He's had to go through so much at such a tender age and

he is now wise beyond his years. He prays for his Dad every morning. His mother had to take him out of public school and place him in a Catholic school so that he would get more individual attention.

Christopher is an amazing, loving boy.  He loves his father so very much and has been in a wonderful, consistent relationship with Patrick since the summer months.  At this time I hope and pray that Patrick is not taken away from him again because Christopher loves and needs him so much and another prolonged separation would destroy this beautiful boy.

Sincerely,

Barbara Grant

To whom it may concern,                                        1-15-18

My name is Thomas Considine. I am the older brother of Patrick Considine. I am 62 years old. I entered Alcoholics Anonymous in 1982 and have been clean and sober since then. I am an active member of AA and have attended thousands of meetings.

I began drinking and drugging at the age of 15. From 15 to 30 years old I was totally absorbed into alcohol and narcotics. I probably could have gone on to a proffessional career of some sort, but sabotaged myself with the drugs and alcohol. Fortunately I was introduced to AA and with the help of many good men and women I was able to get a second chance at life and became a union electrician with Local #3 in N.Y.C. I have had a nice career but know that without AA I would probably be dead of an overdose, AIDS, shooting, etc.

Patrick is one of the most intelligent men I know, but has made some very un-intelligent choices. As an alcoholic and recovering addict myself I could see that the drugs were turning him into another person. A person that was totally absorbed in getting high, no matter the consequences. To witness this change in a loved one is gut wrenching when I knew that the help was out there, but only he could make that choice. His addiction not only affected me, but at times it was tearing our family apart. I believe that his addiction caused him to do so many things that he would not have done if he had a clear head.

I feel that with treatment he can become the man he is supposed to be.

                                        Thomas Considine

Carol Grassi
280 Fendale Street
Franklin Square, NY  11010
516-662.3835

February 1, 2015

To Whom It May Concern:

I am writing a letter in support of my brother Patrick Considine.  Patrick was raised along with 5 siblings in a 2-bedroom 5-story walk up apartment in Queens, the children of two alcoholic parents. Growing up with both parents drinking regularly that was the life-style we grew up with and knew to be "normal."

A regular weekly duty of mine was to go to the bar on Roosevelt Avenue on Thursdays to salvage some of my father's pay before it was all gone as payday was Thursdays.  As a 10 year old, this was my normal routine.  Each week from about the age of 10 on I cared for my younger 3 siblings, Kerry, Patrick and Stacey as in retaliation for my Dad's Thursday nights of drinking, my Mom would say she was off to a doctor's appointment or bingo on a Friday night, which I knew would most likely mean I might not see her for a few days.  Once mom left the house and hit a bar, there was no telling if she would be back or not.  I'm guessing most other kids didn't hold onto their parent's legs and beg them not to go out to bingo, but in our house going to bingo many nights meant we would be on our own for days.  When Mom finally returned after being missing, I remember we would hold our fingers in our ears while my Dad punched her around the kitchen for lying about where she had been.....and so another week went on.

I remember when I was about 15 years old, my older  brother was in the Marines and one was in a rehab, my Dad was long gone....my Mom went out and was missing for days and days.  I had no money but I did have a 10-year-old sister, Patrick who was 8, and a younger sister Stacey who was 6 to care for.  I fed them till there was nothing left but was too embarrassed to ask anyone for help.  Finally out of desperation I called a neighbor to ask her how to make rice soup for dinner.  You see, in my family, I thought everyone ate milky rice for dinner, because that was how we lived each week.  There was never money for "regular" food, so we ate white rice with milk and an egg and milk as a soup each week because that's how you stretch money when you are an alcoholic and have kids to feed.

We were left on our own regularly, and as my 2 older siblings were 5 years older and gone from the house, and the 3 younger ones 5 years younger, I was the one who cared for Patrick in the years my Parents were really mentally gone.   My mom was found wandering drunk and suicidal on a bridge and put in Bellevue, but no one called to tell me, so I just took care of the kids.  At 15 or 16, that's a lot to deal with.

My parents grew up in Hell's Kitchen where my uncle was a bookie, and the "Westies" were the guys that were their cousins and "respected."  We would hear that we might get a new coat that year because some stuff fell off a truck, and this was our normal life.  My Dad entertained Patrick and his pals in the bars when they were 14 and 15 with stories of heists and other crazy drunken stories like it was something to attain.  It was a warped existence.  I remember visiting my Dad and he had someone

Carol Grassi
280 Fendale Street
Franklin Square, NY  11010
516-662.3835

staying in his apartment who had over 100 pounds of Pot in a duffle bag, and he asked me if I wanted to take any.  Not your average mother-father relationship.

I watched episodes of the Brady Bunch and saw people had matching sheets and pillows.  Not only did we not have matching sheets and pillows, we had 1 pillow that 6 of us shared and after someone fell asleep we ripped it out from under their head.  We walked around with linoleum in the soles of our shoes because drinking weekly was more important to our parents than buying us an extra pair of shoes when ours had holes.   Looking back I could be angry with them, but they did the best that they could.  In their own alcoholic way, they did love us…but at that time, they loved the drinking more than providing shoes and food for us.

Somehow living in that life, as the only life we knew, we didn't think it strange that we put plastic bags in our shoes on rainy days and that our father fell asleep with his head face down in the plate of mashed potatoes at the kitchen table.

One night while watching Patrick, Kerry, and Stacey a policeman came to the door around 2am to ask if I had an older brother or sister.  I replied that I did but they were away.  The police officer assumed a teenager had taken out my Mom's car and driven down 69th side-swiping over 7 cars and taking off---but no, it was my Mom who had done it.  I had to get dressed, go to the scene, and leave the 3 kids home alone while I sorted out the mess with the cops.  My Mom came home two days later and never said a word.  Just another drunken night I cleaned up after her, then dressed 3 kids for school, and headed off late to high school

Luckily for me, I escaped the alcoholism and drug abuse and met and married a NYS Court Officer, who even on his deathbed refused medical marijuana.  We had decided  before we married to raise our children in a household where drinking wouldn't be a "normal" thing and never have had alcohol in our home except about once a year for a barbeque.  My kids are 19 and 21 now, and have grown into amazing young adults with bright futures.  This is the future I also envision for Patrick's son Christopher whose Mother Maria is raising him in an alcohol free home too.

If Patrick is given a chance, I will be there as I have always been since he was a baby and support him in his sobriety.  I have raised my children without alcohol in my home, and have had Patrick's son Christopher stay with me regularly since birth.   I have never given up on Patrick even through his darkest days because where there is life, there is hope.

Sincerely,

Carol Grassi